IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| ITEM INDUSTRIETECHNIK GMBH, | ) | Case No. _____ |
| | ) | |
| and | ) | Hon. Judge _____ |
| | ) | |
| ITEM AMERICA LLC, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| MB KIT SYSTEMS, INC., | ) | |
| d/b/a ITEM NORTH AMERICA | ) | |
| | ) | |
| and | ) | |
| | ) | |
| MB KIT SYSTEMS, LTD., | ) | |
| | ) | |
| Defendants. | ) | |

**PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF**
**MOTION FOR PRELIMINARY INJUNCTIVE RELIEF**

Plaintiffs, item Industrietechnik GmbH ("Item GmbH") and item International America LLC ("Item LLC") (collectively referred to as "Item"), by and through their undersigned counsel, respectfully submit this Memorandum of Law in Support of their Motion for Preliminary Injunctive Relief to enjoin MB Kit Systems, Inc., and MB Kit Systems, Ltd. (collectively referred to as "MB Kit" or "Defendants"), from engaging in unfair competition and acts constituting trademark infringement of Item GmbH's federally-registered trademarks.

**FACTUAL BACKGROUND**

Item GmbH is a highly-regarded, globally-recognized industrial and manufacturing company that designs, manufactures, and distributes modular building kits for the construction of

industrial applications and workspaces. As part of its international business, Item GmbH markets and sells its products worldwide through its own trading branches, subsidiaries, and independent distribution partners. To identify the source and quality of the goods and services it provides to customers, Item GmbH uses its three incontestably registered U.S. trademarks (the "ITEM Marks"). In order to protect its valuable brand and reputation, Item GmbH registered the trademark "ITEM" in the United States Patent and Trademark Office ("USPTO") (Reg. No. 1697359, issued on June 30, 1992, and Reg. No. 2290363, issued on Nov. 2, 1999). Additionally, Item GmbH acquired the rights to its current service mark "item (stylized)" on March 1, 2000 (Reg. No. 1573843, issued on Dec. 26, 1989). *See* Verified Compl., Ex. 1. All three of the Item Marks are valid, incontestable, and in good standing.

On February 10, 2007, Item America entered into a five-year contract with MB Kit to market and distribute Item GmbH's products in the states of Ohio, Michigan, Pennsylvania, West Virginia, Kentucky, and Indiana (the "Distribution Agreement"). *See* Verified Compl., Ex. 3. Item America and MB Kit renewed the Distribution Agreement for another five-year term ending on February 28, 2017. In addition to the Distribution Agreement, on April 30, 2014, Item GmbH and MB Kit also executed an agreement for use of the trade name "Item North America." Verified Compl., Ex. 4.

Both the Distribution Agreement and the Name Use Agreement plainly state that MB Kit is no longer authorized to use any trade name, trademark, or other Item designation after the expiration of the Distribution Agreement. Section 2.7 of the Distribution Agreement states:

> ***item GmbH remains the exclusive owner of the trade name and trademark "item".*** The registration of any domain name that contains the word "item" by the Distribution Partner shall be subject to the prior written consent of item GmbH or of Item America acting pursuant to authority granted by item GmbH, and ***any such registration shall be terminated and no longer used by the***

2

> ***Distribution Partner upon termination or expiration of this Agreement*** except as otherwise provided in clause 5.1.

Verified Compl., Ex. 3 § 2.7 (emphasis added). Additionally, Section 5.1 provides:

> The Distribution Partner shall no longer be entitled to use the designation distribution partner of Item America after this Agreement has been terminated. In such case, the Distribution Partner shall without delay and at its own expense have this designation removed from any objects it intends to continue using. ***In addition, the Distribution Partner shall no longer be entitled to use the trade name or trademark "item" after the termination of this Agreement.*** Neither may it use the designation "previously item". If requested by Item America, the Distribution Partner shall without undue delay after the termination of this Agreement and at its own expense transfer to Item America or any third party named by it any domain name registered by the Distribution Partner which contains the word "item".

*Id.* § 5.1 (emphasis added). *See also* Verified Compl., Ex. 4 § 3.1(MB Kit's authorization to use the trade name "Item North America" under Name Use Agreement terminates upon expiration of the Distribution Agreement.)

As a result of Item America's decision not to renew the Distribution Agreement, MB Kit's authorization to use the ITEM Marks, the trade name "Item North America," and other Item logos, symbols, content, domain names, or other similar designations of origin or affiliation (collectively "Item Branding"), expired on February 28, 2017. In March 2017, MB Kit confirmed that it had ceased its use of the Item Marks and Item Branding with the exception of the Item logo painted on the roof of MB Kit's facility. MB Kit claimed that the logo could not be removed due to the winter weather in Northern Ohio, but represented that it would be removed once the weather improved. Relying upon MB Kit's representations that it ceased using the ITEM Marks and Item Branding, Item and MB Kit continued their business relationship in a standard customer-supplier capacity, and Item permitted MB Kit to buy and sell Item products at a discounted rate.

Despite the clear-cut contractual language, in both German and English, unquestionably revoking any authority MB Kit had to use the ITEM Marks, trade names, or Item Branding, and representations that it had ceased all use of the Item likeness, MB Kit has ***intentionally*** continued to trade on the name and reputation of Item in an effort to compete in the marketplace with goods and services ***identical*** to those provided by Item. In January 2018, almost a year after MB Kit's authorization expired and despite numerous reminders to MB Kit that it was no longer authorized to use the ITEM Marks, trade names, or Item Branding, Item America identified sixteen instances where MB Kit continued to use Item-owned content. *See* Verified Compl., Ex. 9. MB Kit's unauthorized uses spanned a wide variety of sales and promotional activities ranging from use of the ITEM Marks on its Facebook page to allowing customers to download Item's catalog to various Item-owned drawings and content on MB Kit's blog. Additionally, despite MB Kit representing that it would remove the ITEM Mark from its roof nearly a year prior, the ITEM Mark remained clearly visible on the roof of MB Kit's facility. *See* Verified Compl., Ex. 9.

In a last-ditch effort to salvage their customer-supplier relationship, Item America offered MB Kit a chance to continue receiving discounts conditioned upon MB Kit ceasing all use of the ITEM Marks, Item trade names, and Item Branding. *See id.* On January 29 and January 31, 2018, MB Kit again confirmed that that it had ceased all use of Item-owned content that was not in external hands with one supposedly lone exception: the roof. *See* Verified Compl., Ex. 10. Despite MB Kit's representations to the contrary, MB Kit again failed to live up to its end of the bargain, and Item America eventually ceased all delivery of Item goods to MB Kit in August 2018.

The above-referenced facts and correspondence undoubtedly demonstrate that MB Kit knew it lacked authorization to use the ITEM Marks, Item trade names, or the Item Branding in

4

any capacity after February 28, 2017. Despite MB Kit's representation that it had discontinued all use Item-content, in March 2019, Item America discovered that MB Kit was continuing to engage in unauthorized use by distributing business cards with the ITEM Marks to shared potential customers while at a tradeshow in Akron, Ohio. Verified Compl. ¶ 45. Also in March 2019, Item America was informed by a customer that it had received brochures months prior from MB Kit bearing the ITEM Marks and Item trade name with MB Kit's address.

In addition to MB Kit's blatant use of the ITEM Marks on advertising and promotional material, Item has also discovered that MB Kit has unfairly competed and deceived customers through other intentional actions including:

- MB Kit has informed at least one customer that MB Kit is/was still a seller/distributor of Item GmbH products after termination of the Distribution Agreement;
- MB Kit has filled orders for Item GmbH products with its own products and/or with products from an unknown competitor;
- MB Kit has continued to use Item America email addresses to receive and respond to requests from customers for quotes on potential projects;
- MB Kit has failed to inform customers that it no longer supplies Item GmbH products but continues to fill customer orders under the guise of an authorized Item GmbH and/or Item America vendor; and
- MB Kit has informed and/or continues to inform customers that place orders for Item GmbH products that the products are back-ordered because they are having a problem with the supplier (Item).

Verified Compl. ¶ 48.

As shown above, MB Kit's deliberate and illegal actions exhibit a conscious disregard for both its contractual obligations and the trademark laws of the United States. By intentionally choosing to use the ITEM Marks despite numerous representations that it had ceased such uses, MB Kit has irreparably harmed Item by procuring sales discounts through misrepresentations and usurping sales that rightfully belonged to Item, and MB Kit continues to irreparably harm Item by infringing upon its valuable trademarks and staining its distinguished reputation. To prevent MB Kit from continuing to engage in such harmful actions, Item requests that this Court grant the preliminary injunctive relief requested in its Verified Complaint.

## ARGUMENT

As the Sixth Circuit has previously held, "'[i]njunctive relief is the remedy of choice for trademark and unfair competition cases, since there is no adequate remedy at law for injury caused by a defendant's continuing infringement.'" *Audi AG v. D'Amato*, 469 F.3d 534, 550 (6th Cir. 2006) (quoting *Century 21 Real Estate Corp. v. Sandlin*, 846 F.2d 1175, 1180 (9th Cir. 1980)). When considering whether to award a preliminary injunction, this Court must balance "(1) the likelihood that the movant will succeed on the merits, (2) whether the movant will suffer irreparable harm without the injunction, (3) the probability that granting the injunction will cause substantial harm to others and (4) whether the public interest will be advanced by issuing the injunction." *Lorillard Tobacco Co. v. Amouri's Grand Foods, Inc.*, 453 F.3d 377, 380 (6th Cir. 2006). Notably, "'[t]he four considerations applicable to preliminary injunction decisions are factors to be balanced, not prerequisites that must be met.'" *Butler v. Hotel California, Inc.*, 106 F. Supp. 3d 899, 904 (N.D. Ohio 2015) (quoting *Jones v. City of Monroe*, 341 F.3d 474, 476 (6th Cir. 2003)). While it is "'generally useful for the district court to analyze all four of the preliminary injunction factors,'" a district court need not "make specific findings concerning

each of the four factors" if "fewer factors are dispositive of the issue." *Id.* (quoting *Certified Restoration Dry Cleaning v. Tenke Corp.*, 511 F.3d 535, 542 (6th Cir. 2007), and citing *Jones v. City of Monroe*, 341 F.3d 474, 476 (6th Cir. 2003)).

In the instant case, Item easily satisfies all four factors. First, Item is more than likely to succeed on the merits because there is no question that MB Kit has infringed upon Item's incontestable trademarks, has breached the plain language of both the Distribution Agreement and the Name Use Agreement, and has engaged in unfair trade practices by misrepresenting and falsely designating the origin of its goods. Second, MB Kit's actions have already caused irreparable harm to Item by diverting customers that mistakenly believed they were ordering Item products and by tarnishing Item's reputation by leading customers to believe that orders were incapable of being filled due to problems with Item. Third, the injunction poses no risk of harm to any individual or entity other than MB Kit, whose own actions demand the issuance of the injunction in the first place. Lastly, it is in the public's best interest to prevent confusion and deception among consumers and to uphold the U.S. trademark laws to prevent such obvious infringement and unfair competition.

**I.     Item Is Likely to Succeed on the Merits**

To demonstrate a likelihood of success on the merits of a claim with respect to a preliminary injunction, a plaintiff must "show more than a mere possibility of success. However, it is ordinarily sufficient if the plaintiff has raised questions going to the merits so serious, substantial, difficult, and doubtful as to make them a fair ground for litigation and thus for more deliberate investigation." *Six Clinic Holdings Corp., II v. Cafcomp Sys. Inc.*, 119 F.3d 393, 402 (6th Cir. 1997) (internal citations omitted). Because the evidence before the Court not only demonstrates a probability of success, as opposed to a mere possibility, and certainly raises

serious questions that warrant deliberate investigation, this Court should find that Item is more than likely to succeed on the merits and balance this factor in favor of awarding preliminary injunctive relief.

    **A.    Trademark Infringement and False Designation of Origin under the Lanham Act (15 U.S.C. §§ 1114(1), 1125(a))**

In the Sixth Circuit, "[t]o state a claim for trademark infringement under the Lanham Act, a plaintiff must allege facts establishing that: (1) it owns the registered trademark; (2) the defendant used the mark in commerce; and (3) the use was likely to cause confusion." *Hensley Mfg. v. ProPride, Inc.*, 579 F.3d 603, 609 (6th Cir. 2009) (citing 15 U.S.C. 1114(1)). To recover for a claim of false designation of origin, a plaintiff must prove two elements: "(1) the false designation must have a substantial economic effect on interstate commerce; and (2) the false designation must create a likelihood of confusion." *Johnson v. Jones*, 149 F.3d 494, 502 (6th Cir. 1998) (citing *Lyon v. Quality Courts United, Inc.*, 249 F.2d 790, 795 (1957)). Because the jurisdictional elements are essentially identical, a party can recover for both trademark infringement and unfair competition under the same showing of a likelihood of confusion as "likelihood of confusion is [also] the essence of an unfair competition claim." *See id.* (internal quotation marks omitted).

Regarding the first element of the trademark infringement claim, Item GmbH undoubtedly owns three valid, incontestable, and federally registered trademarks, and the registration of the ITEM Marks is *prima facie* evidence of the validity of the ITEM Marks, of Item GmbH's ownership of the ITEM Marks, and of Item's ***exclusive right*** to use the marks in connection with its goods and services. *See* 15 U.S.C. § 1057(b); 15 U.S.C. § 1115(a).

Regarding the jurisdictional elements of both claims, MB Kit has certainly used the ITEM Marks in U.S. commerce, as exhibited by the brochures and business cards, in such a way

8

to identify the source of the goods and services that MB Kit is offering for sale. *See Lorillard Tobacco Co. v. Amouri's Grand Foods, Inc.*, 453 F. 3d 377, 381 (6th Cir. 2006) (quoting *El Greco Leather Prods. Co. v. Shoe World, Inc.*, 806 F.2d 392, 396 (2d Cir.1986)) ("[W]e can think of no clearer 'use' of goods 'in commerce' than offering them for sale."). MB Kit's actions and false designations have also had a substantial effect on both interstate and international commerce due to MB Kit's intentional distribution of promotional material bearing the ITEM Marks to numerous customers in multiple states. Thus, Item is clearly likely to succeed on the merits in regard to the initial elements of each claim.

Regarding the final element for each claim, the Sixth Circuit uses the following standard to evaluate likelihood of confusion:

> In determining whether a likelihood of confusion exists, a court will typically weigh the following eight factors: (1) strength of the senior mark; (2) relatedness of the goods or services; (3) similarity of the marks; (4) evidence of actual confusion; (5) marketing channels used; (6) likely degree of purchaser care; (7) the intent of defendant in selecting the mark; and (8) likelihood of expansion of the product lines.

*Hensley*, 579 F.3d at 610. "While all of these factors are relevant, actual confusion is "'obviously the most probative proof of the likelihood of confusion.'" *U.S. Structures, Inc. v. J.P. Structures, Inc.*, 130 F.3d 1185, 1190 (6th Cir. 1997) (quoting *Frisch's Rest., Inc. v. Shoney's Inc.*, 759 F.2d 1261, 1267 (6th Cir. 1985)). Importantly, the Sixth Circuit has also noted that:

> If a party chooses a mark with the intention of creating confusion between its products and those of another company, "that fact alone may be sufficient to justify an inference of confusing similarity." Circumstantial evidence of copying, particularly "the use of a contested mark with knowledge of the protected mark at issue," is sufficient to support an inference of intentional infringement where direct evidence is not available.

*Therma-Scan, Inc. v. Thermoscan, Inc.*, 295 F.3d 623, 638–39 (2002) (internal citations omitted).

The likelihood of confusion in the instant case is readily apparent. First, as shown in the Verified Complaint, Item is aware of numerous instances where MB Kit has used marks *identical* to ITEM Marks to represent that it is affiliated with Item GmbH/Item America. MB Kit's unauthorized use of the ITEM Marks and misrepresentations of affiliation with Item, despite knowledge that it lacked authorization to use such designations, demonstrates how MB Kit has *intentionally* deceived shared customers into incorrectly believing that MB Kit is still an authorized distributor of genuine Item goods.

Although the actual confusion between MB Kit and Item is more than enough to support a finding of likelihood of confusion in this matter, the remaining factors are equally supportive. The ITEM Marks are both commercially and conceptually strong because they are inherently distinctive in the fields in which both MB Kit and Item GmbH operate, and purchasers recognize the ITEM Marks as an indication that Item GmbH is the exclusive source of the particular goods and services being purchased. *See Homeowners Grp. v. Home Marketing Specialists, Inc.*, 931 F.2d 1100, 1107 (6th Cir. 1991) (quoting *Frisch's Restaurant, Inc. v. Shoney's Inc.*, 759 F.2d 1261, 1264 (6th Cir. 1985)) ("'A mark is strong if it is highly distinctive, i.e., if the public readily accepts it as the hallmark of a particular source . . . .'"); *see also Progressive Distr. Servs., Inc. v. United Parcel Serv., Inc.*, 856 F. 3d 416, 431–32 (6th Cir. 2017) ("[A] strong mark enjoys greater protection.").

Actual confusion is also likely because in appearance, connotation, and overall commercial impression, the ITEM Marks used by MB Kit are identical to the ones owned and registered by Item GmbH; and MB Kit and Item GmbH also provide identical goods and services, have the same customer base, directly compete in the same industry, use the same marketing channels to reach consumers, including trade shows and salespersons. *See Progressive*

*Distr. Servs., Inc.*, 856 F. 3d at 431–32 ("[T]he relatedness inquiry focuses on whether goods or services that are similarly marketed and appeal to common customers are likely to lead consumers to believe that they come from the same source, or are somehow connected with or sponsored by a common company.") (internal quotations and citations omitted). By choosing to use the ITEM Marks in connection with its directly-competitive business despite possessing knowledge that the ITEM Marks are protected, MB Kit intended to create, and actually has created, consumer confusion between itself and Item as well as its products and Item products, with the goal of increasing MB Kit's sales. *See Kellogg Co. v. Toucan Golf, Inc.*, 337 F.3d 616, 624 (6th Cir. 2003) ("[I]f the parties **compete directly**, confusion is likely if the marks are sufficiently similar . . . .") (emphasis added). Due to MB Kit's intentional use of marks identical to the ITEM Marks and its affirmative misrepresentations to customers regarding the origin of its goods, it is not possible for even the most cautious consumer to determine that he is not receiving genuine Item goods prior to purchase. *See Daddy's Junky Music Stores, Inc. v. Big Daddy's Family Music Ctr.*, 109 F.3d 275, 286 (6th Cir. 1997) (citing *Champions Golf Club, Inc. v. Champions Golf Club*, Inc., 78 F.3d 1111, 1120-21 (6th Cir.1996)) ("[C]onfusingly similar marks may lead a purchaser who is extremely careful and knowledgeable about the instrument that he is buying to assume nonetheless that the seller is affiliated with or identical to the other party.").

In this action, trademark infringement by MB Kit is almost certain because as the Third Circuit succinctly noted, "[o]nce a license has expired, use of the formerly licensed trademark constitutes infringement." *U.S. Jaycees v. Philadelphia Jaycees*, 639 F.2d 134, 143 (3rd Cir. 1981) (citing *Prof'l Golfers Ass'n v. Bankers Life & Casualty Co.*, 514 F.2d 665, 670 (5th Cir. 1975)). As such, every factor to be considered by the Court supports a finding that Item is likely

to succeed on the merits of its trademark infringement and unfair competition claims, and the Court should find that the first factor weighs in favor of awarding preliminary injunctive relief.

### B. Deceptive Trade Practices under R.C. § 4165.02 and Claims under Ohio Common Law

Item is equally as likely to succeed on the merits of its Ohio Deceptive Trade Practices Act ("ODTPA") and Ohio common law claim as it is on its Lanham Act claims because the analysis is the same. When analyzing these two claims, courts in this Circuit have held that the analysis is identical to its federal counterpart:

> In federal trademark infringement claims under 15 U.S.C. § 1114, "the touchstone of liability ... is whether the defendant's use of the disputed mark is likely to cause confusion among consumers regarding the origin of the goods offered by the parties." *Daddy's Junky Music Stores, Inc. v. Big Daddy's Family Music Ctr.*, 109 F.3d 275, 280 (6th Cir.1997). Likewise, to succeed on a false designation of origin claim, a plaintiff must show that the false designation creates a "likelihood of confusion." *Johnson v. Jones*, 149 F.3d 494, 502 (6th Cir.1998). ***Claims for trademark infringement and false designation of origin under the Ohio Deceptive Trade Practices Act and Ohio common law are subject to the same standards as their federal counterparts***. *See Daddy's Junky Music*, 109 F.3d at 288. Additionally, "[b]oth Ohio and federal courts have recognized that the same analysis applies to claims under Ohio's statutory and common law of unfair competition and the Lanham Act." *Abercrombie & Fitch Stores, Inc. v. Am. Eagle Outfitters, Inc.*, 280 F.3d 619, 626 n. 2 (6th Cir.2002).

*Mountain Top Beverage Grp., Inc. v. Wildlife Brewing N.B., Inc.*, 338 F. Supp. 2d 827, 831-32 (S.D. Ohio 2003) (emphasis added); *see also Worthington Foods, Inc. v. Kellogg Co.*, 732 F. Supp. 1417, 1431 (S.D. Ohio 1990) ("The Ohio Deceptive Trade Practices Act is substantially similar to section 43(a) of the Lanham Act. In fact, an analysis appropriate for a determination of liability under section 43(a) of the Lanham Act is also appropriate for determining liability under the Ohio Deceptive Trade Practices Act.") (internal citations omitted).

Because Item is substantially likely to prevail on its federal trademark and unfair competition claims, Item is similarly likely to prevail on the merits of its ODTPA (Count III) and

common law claims (Count IV). The Court should therefore find that the balance of this factor also weighs in favor of issuing a preliminary injunction.

## C. Breach of Contract

Lastly, Item America is also likely to prevail on the merits of its breach of contract claim. Under Ohio law:

> In order to substantiate a breach of contract claim, a party must establish four elements: (1) a binding contract or agreement was formed; "[(2)] the nonbreaching party performed its contractual obligations; [(3)] the other party failed to fulfill its contractual obligations without legal excuse; and [(4)] the nonbreaching party suffered damages as a result of the breach."

*Carbone v. Constr. Grp., L.L.C.*, 83 N.E.3d 375, 380 (Ohio Ct. App. 2017) (quoting *Textron Fin. Corp. v. Nationwide Mut. Ins. Co.*, 684 N.E.2d 1261 (Ohio Ct. App. 1996).

In the instant case, there is no question that the Distribution Agreement was a binding and enforceable contract and that Item America fulfilled its contractual obligations under that Agreement prior to its expiration. *See* Verified Compl. ¶ 103 & Ex. 3. It is also evident that the plain terms of the Distribution Agreement forbid MB Kit from using any of the ITEM Marks, Item Branding, or Item trade names after the expiration of the contract. *See* Verified Compl. ¶ 23 & Ex. 3 §§ 2.7, 5.1. Through its use of the ITEM Marks and Item Branding, as plainly demonstrated by the business cards and brochure, MB Kit has intentionally, repeatedly, and without legal excuse breached the terms of the Distribution Agreement in an effort to further its own self-interest. *See* Verified Compl. ¶¶ 31-49. As a result of MB Kit's breaches, Item America and Item Gmbh have foregone an untold amount of economic opportunities and customer orders that rightfully belonged to them. For the foregoing reasons, Item America is certainly likely to succeed on the merits of its breach of contract claim.

## II. MB Kit Has Caused and Will Continue to Cause Item Irreparable Harm

MB Kit's infringement, unfair competition and blatant disregard for the terms of the Distribution Agreement poses a significant threat to the goodwill and reputation that Item has cultivated in the U.S. over the last three decades. Regarding irreparable harm, the Sixth Circuit has previously opined that "our Circuit requires no particular finding of its likelihood to support injunctive relief in cases of this type, for 'irreparable injury "ordinarily follows when a likelihood of confusion or possible risk to reputation appears" from infringement or unfair competition.'" *Lorillard Tobacco Co. v. Amouri's Grand Foods, Inc.*, 453 F. 3d 377, 380-81 (6th Cir. 2006) (citing *Circuit City Stores, Inc. v. Carmax, Inc.*, 165 F.3d 1047, 1056 (6th Cir. 1999)); *see also Lucky's Detroit, LLC v. Double L, Inc.*, 533 F. App'x 553, 555 (6th Cir. 2013) ("In trademark infringement cases, a likelihood of confusion or possible risk to the requesting party's reputation satisfies the irreparable injury requirement."); *Wynn Oil Co. v. American Way Serv. Corp.*, 943 F.2d 595, 608 (6th Cir. 1991) ("The irreparable injury flows 'both from the potential difficulty of proof of plaintiff's damages, and also from the impairment of intangible values . . . .'") (quoting *Koppers Co., Inc. v. Krupp-Koppers GmbH*, 517 F. Supp. 836, 850 (W.D. Pa. 1981)).

Under the Sixth Circuit precedent above, MB Kit's actions have already caused irreparable harm to Item by intentionally causing confusion in the marketplace and risking its reputation with consumers. Similar to the scenario addressed by the Court in *Lorillard Tobacco*, additional harm in the instant case "stems from [Item's] loss of control over the quality of goods that bear its marks" or are represented as genuine Item products. *See Lorillard Tobacco, Co.*, 453 F.3d at 382. Given MB Kit's prior misrepresentations that it would cease use of the ITEM

Marks, Item Branding and Item trade names, it is now apparent that nothing short of a court-ordered injunction can curtail the irreparable harm that MB Kit intentionally continues to cause.

## III. The Balance of Harms Weighs in Favor of Injunctive Relief

When assessing the third factor, Courts are required to "(1) balance the harm [plaintiff] would suffer if its request for a preliminary injunction were denied against the harm [defendant] would suffer were an injunction to issue, and (2) assess the impact the preliminary injunction might have on relevant third parties." *Perfetti Van Melle USA v. Cadbury Adams USA LLC*, 732 F. Supp. 2d 712, 726 (E.D. Ky. 2010) (citing *Procter & Gamble Co. v. Georgia-Pacific Consumer Prods. LP*, 2009 WL 2407764, at *10 (S.D. Ohio Aug. 3, 2009)).

Regarding the first inquiry, the balancing of harm between MB Kit and Item, the irreparable harm to Item vastly outweighs any inconvenience that MB Kit may suffer if forced to comply with obligations it is already under a duty to perform pursuant to the Distribution Agreement. As phrased by another court in the Sixth Circuit, this factor should not weigh in MB Kit's favor because MB Kit "cannot place itself in harms' way, and then later claim that an injunction should not issue because of costs which it must incur in order to remedy its own misconduct." *Midwest Guar. Bank v. Guar. Bank*, 270 F. Supp. 900, 924 (E.D. Mich. 2003). As demonstrated above, Item has been, and will continue to be, irreparably harmed by MB Kit's infringement and unfair competition. Thus, the balance of the scales easily tips towards the award of an injunction when comparing the irreparable harm to Item versus the mere cost of compliance to MB Kit.

Regarding the second consideration, the impact of an injunction on third-parties, that factor also weighs in favor of injunctive relief. The shared customers of MB Kit and Item would actually ***benefit*** from the issuance of an injunction as opposed to being harmed. The injunction

would assure consumers of the genuineness of the goods being purchased and alleviate the actual confusion between MB Kit and Item that currently exists. Additionally, Item is more than capable of fulfilling the need for any goods consumers might be obtaining from MB Kit, thus lessening the burden on third-parties to achieve any tasks which involve goods or services being improperly provided by MB Kit under the guise of Item.

Accordingly, because the irreparable harm to Item outweighs any harm to MB Kit and because third-parties would actually benefit from the elimination of confusion in the marketplace, the third factor also weighs in favor of injunctive relief.

## IV. <u>Injunctive Relief is in the Public's Interest</u>

The final factor also weighs in favor of granting Item's request for preliminary injunctive relief. Because MB Kit is intentionally infringing upon Item GmbH's valid, federally registered trademarks and causing actual confusion in the marketplace, granting injunctive relief in this action "would advance two fundamental purposes of trademark law: preventing consumer confusion and deception in the marketplace and protecting the trademark holder's property interest in the mark." *Lorillard Tobacco, Co.*, 453 F.3d at 383 (citing *Ameritech, Inc. v. Am. Info. Techs. Corp.*, 811 F.2d 960, 964 (6th Cir.1987)). Upholding the fundamental purpose behind the U.S. patent and trademark laws, as codified by the Lanham Act, certainly tips the balance of this factor in favor of awarding preliminary injunctive relief. As one court observed, "[t]he policy behind protecting trademarks is to prevent the public from being misled as to the source or origin of the goods or services they are buying. . .. Thus, enjoining Defendant from using a mark confusingly similar to [Plaintiff's] mark would best serve the public interest." *Big Boy Rests. V. Cadillac Coffee Co.*, 283 F. Supp. 2d 866, 873 (E.D. Mich. 2002).

Similar to the reasons demonstrated above, the interests of the public are best served by an injunction curtailing MB Kit's unauthorized and intentional use of the ITEM Marks, Item Brand and Item trade names. As such, the final factor also falls in favor of granting Item's request for injunctive relief in this case.

## CONCLUSION

For the foregoing reasons and those that may be offered at oral argument, this Honorable Court should grant Item's Motion for Preliminary Injunctive Relief because: (1) Item is likely to prevail on the merits of all five of its claims; (2) Item is already suffering and will continue to suffer irreparable harm absent injunctive relief; (3) the irreparable harm to Item outweighs any claimed harm to MB Kit, and third-parties will benefit from the injunction; and (4) it is in the public's best interest to eliminate confusion in the marketplace and uphold the trademark laws of the United States.

Respectfully submitted,


/s/ Kip T. Bollin_____
Kip T. Bollin (0065275)
Melissa A. Barrett (0096882)
**THOMPSON HINE LLP**
3900 Key Center
127 Public Square
Cleveland, OH 44114
Phone: (216) 566-5500
Fax: (216) 566-5800
Email: kip.bollin@thompsonhine.com
melissa.barrett@thompsonhine.com

Jesse Jenike-Godshalk (0087964)
**THOMPSON HINE LLP**
312 Walnut Street
14th Floor
Cincinnati, OH 45202-4089
Phone: (513) 352-6702
Fax: (513) 241-4771
Email: jesse.jenike-godshalk@thompsonhine.com


Laura Golden Liff *(Pro Hac Vice pending)*
Jeremy L. Baker *(Pro Hac Vice pending)*
**MILES & STOCKBRIDGE P.C.**
1751 Pinnacle Drive, Suite 1500
Tysons Corner, VA 22102
Phone: 703-903-9000
Fax: 703-610-8686
lliff@milesstockbridge.com
jbaker@milesstockbridge.com

*and*

Karl W. Means *(Pro Hac Vice pending)*
**MILES & STOCKBRIDGE P.C.**
1500 K Street, NW, Suite 800
Washington, DC 20005-1209
Phone: 202-737-9600
Fax: 410-698-4490
kmeans@milesstockbridge.com

## **CERTIFICATE OF SERVICE**

I HEREBY CERTIFY, that on April 22, 2019, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will then send a notification of such filing (NEF) to all counsel of record.

/s/ Kip T. Bollin
Kip T. Bollin